**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DAPHENE C. ADAMSON-JAMES,**

> **Plaintiff,**

**v.**                                                        **Case No:  6:11-cv-628-Orl-36TBS**

**FLORIDA DEPARTMENT OF**
**CORRECTIONS, EDITH DECICCO,**
**BARBARA SCALA and JOHN DOES 1 -**
**10,**

> **Defendants.**

_____

## ORDER

This cause comes before the Court on two motions for summary judgment on Plaintiff Daphene C. Adamson-James's ("Plaintiff") Third Amended Complaint:  (1) Defendant Florida Department of Corrections' ("FDOC") Motion for Summary Judgment ("FDOC's Motion for Summary Judgment") (Doc. 116); and (2) Defendants Edith DeCicco ("DeCicco") and Barbara Scala's ("Scala") Motion for Summary Judgment ("Individual Defendants' Motion for Summary Judgment") (Doc. 117).[1]   As explained in further detail below, Plaintiff has not filed a substantive response to the Motions for Summary Judgment, and the time to do so has expired. Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the Motions for Summary Judgment will be granted.

_____

[1] The FDOC, DeCicco and Scala are collectively referred to as "Defendants."  The FDOC's Motion for Summary Judgment and the Individual Defendants' Motion for Summary Judgment are collectively referred to as the "Motions for Summary Judgment."

## I.   BACKGROUND

### A.   Undisputed Facts[2]

Plaintiff began working for the FDOC in November 1987.  Doc. 111-1, Deposition of Daphene C. Adamson-James ("Pl.'s Dep."), 24:7–8.  In August 2006, she was given a promotion—termed a "lateral reassignment"—to the position of Correctional Probation Supervisor at the FDOC's Cocoa Probation Office.  *Id.* at 24:9–16; Doc. 112-1, Affidavit of Barbara Scala ("Scala Aff."), ¶ 3; Doc. 115-1, Affidavit of Edith S. DeCicco ("DeCicco Aff."), ¶ 3.  Her promotion was supported by Scala, a Regional Director for the FDOC, and DeCicco, a Circuit Administrator for the FDOC.  Scala Aff., ¶ 3; DeCicco Aff., ¶ 3.

In 2008 and 2009, Plaintiff's direct supervisor at the Cocoa office was Anthony Jordan ("Jordan").  Pl.'s Dep., 48:21–22; Doc. 113-1, Affidavit of Anthony Jordan ("Jordan Aff."), ¶ 2.  Plaintiff acknowledges that there were "management problems" in the Cocoa office during this time because she and Jordan had "different philosoph[ies]" of being a supervisor, and that these differing philosophies led to "friction" between the two of them.  Pl.'s Dep., 55:1–21.  Plaintiff found the "demands of the job to be unreasonable."  *Id.* at 29:24–25.  One of Plaintiff's job duties was reviewing IT60 forms, which are checklists reviewed by supervisors to ensure that specified tasks have been completed with respect to offenders under the supervision of an FDOC probation officer.  Scala Aff., ¶ 7.  FDOC policies required that supervisors complete their IT60 reviews within 60 days of the date that the offender was assigned to them.  *Id.*; Pl.'s Dep., 69:10– 19.  However, Plaintiff claims that she and other supervisors were too overworked to properly complete their IT60 reviews within the 60-day time limit.  *See* Doc. 112-3, pp. 2–3; Pl.'s Dep.,

---

[2] This Statement of Facts is derived primarily from Plaintiff's deposition testimony, the affidavits of Anthony Jordan and Defendants DeCicco and Scala, and the respective exhibits thereto.  At this stage, the Court is obliged to construe the facts in the light most favorable to Plaintiff.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

69:21–24.  To combat this problem, Plaintiff and other supervisors would enter a code on the IT60 form to "close" a particular case within the 60-day time limit, and then enter a "re-review code" to re-open the case, in contravention of FDOC policy.  *See* Doc. 112-3, pp. 2–3; Pl.'s Dep., 32:11–15, 72:16–21, 73:11–14; Scala Aff., ¶ 8.  By doing this, they were able to effectively extend the time to complete their IT60 reviews.  *See* Doc. 112-3, pp. 2–3; Pl.'s Dep., 72:16–21, 73:11–14; DeCicco Aff., ¶ 5.  On several occasions, Plaintiff complained to Jordan, DeCicco, and Scala, via email or in person, that she and other supervisors were too overworked to properly complete case reviews within the 60-day time limit.  *See* Doc. 112-3, pp. 2–4; Pl.'s Dep., 74:7–11, 104:24–106:2.

On April 6, 2009, Jordan issued Plaintiff's annual performance evaluation, a copy of which Plaintiff received and signed.  Jordan Aff., ¶ 3; *see* Doc. 115-2, pp. 3–7.  In the performance evaluation, Jordan gave Plaintiff a score from 1 to 5 with respect to various "performance expectations," such as communication and efficiency, with "1" being "Unacceptable," "2" being "Below Expectation," "3" being "Meets Expectation," "4" being "Above Expectation," and "5" being "Exceptional."  Doc. 115-2, pp. 3–7.  The average of the various scores equaled Plaintiff's "overall annual evaluation score."  *Id.* at 3.  Plaintiff's overall annual evaluation score was 3.69, thus falling between "Meets Expectation" and "Above Expectation."  *Id.*

The scores in each performance category were also accompanied by descriptive comments from Jordan.  *See id.* at 4–7.  In several comments, Jordan noted Plaintiff's struggles with timeliness in completing her work.  With respect to Plaintiff's supervisory skills, Jordan marked her as "Below Expectation" and wrote:

> As a result of [Plaintiff's] management of investigations and other related work, subordinate staff's work is delayed and priority issues suffer.  Subordinate staff

3

sometimes become frustrated and lack direction.  Office goals with regard to completion of investigations are not met.

*Id.* at 5.  With regard to Plaintiff's ability to complete investigations properly and timely, Jordan marked her as "Below Expectation" and wrote:

> [Plaintiff] is very efficient with regards to ensuring that investigations are accurate, complete, properly documented and verified.  However, her timeliness in completing investigations does not meet expectations.  Investigations are often extended and completed far beyond expected due dates and some investigations within the CC Unit have had to be addressed by the office manager.

*Id.* at 7.  In a final summary comment, Jordan wrote:

> [Plaintiff] can be a very valuable resource.  Her knowledge and attention to detail is very helpful in regards to the supervision and training of officers; however, some administrative duties and attention to due dates often becomes secondary to her eye for detail and accuracy.  Her ability to prioritize work and meet certain procedural time constraints needs improvement . . . .

*Id*.

On April 20, 2009, DeCicco met with Plaintiff to discuss the performance review.  DeCicco Aff., ¶ 5; Pl.'s Dep., 79:3–80:2.  One specific area of concern that DeCicco discussed was Plaintiff's improper use of re-review codes to extend the time for completing IT60 reviews beyond the 60-day limit.  DeCicco Aff., ¶ 5; Pl.'s Dep., 79:3–11.  DeCicco told Plaintiff to stop entering re-review codes in this manner, and to manage her time so that she could properly complete her duties as a supervisor.  DeCicco Aff., ¶ 5; Pl.'s Dep, 79:3–7.  DeCicco told Plaintiff that Jordan was following DeCicco's instructions in not allowing ongoing extensions to work assignments.  DeCicco Aff., ¶ 5.  DeCicco avers that she also told Plaintiff to stop arguing with Jordan in front of the staff and to stop slamming doors, but Plaintiff denies that such acts ever happened or that they were discussed at the meeting.  *Id.* at ¶ 8; Pl.'s Dep., 49:14–19, 79:17–80:19.  DeCicco told Plaintiff that if she could not find a way to work with Jordan on a professional basis, she could expect to be moved to another work unit.  DeCicco Aff., ¶ 5.

In July 2009, Scala and DeCicco were informed that the staff at the Cocoa office had submitted a letter complaining about the management there, particularly Jordan's style of management. Scala Aff., ¶ 10; DeCicco Aff., ¶ 9. Thereafter, Scala and DeCicco met with supervisors and staff at the Cocoa office to discuss those complaints. Scala Aff., ¶ 10; DeCicco Aff., ¶ 9. During those meetings, staff members complained about both Jordan and Plaintiff. Scala Aff., ¶ 10; DeCicco Aff., ¶ 9. Staff members told Scala and DeCicco that Plaintiff would "hold" their work, causing undue delay in the completion of their job duties. Scala Aff., ¶ 10; DeCicco Aff., ¶ 9. Staff members also complained that she would be overly critical about minor errors, such as using the incorrect font size, and that she was often unavailable or out of the office. Scala Aff., ¶ 10; DeCicco Aff., ¶ 9. Staff members said that Jordan and Plaintiff would have loud arguments in front of them. Scala Aff., ¶ 10. Jordan admitted that there were management and morale problems in the Cocoa office, and that there were conflicts between him and Plaintiff that were detrimental to the office. *Id.* at ¶ 11; DeCicco Aff., ¶ 9. Jordan informed Scala and DeCicco that Plaintiff was considerably behind in her work, failed to complete her IT60 reviews in a timely manner, and was not good at budgeting her time. Scala Aff., ¶ 11. Scala avers that Plaintiff did not admit to any problems on her end and that she offered no ideas for improvement, but Plaintiff denies that she was asked about these issues. *Id.*; Pl.'s Dep., 56:10–22.

As a result of the meetings with supervisors and staff, Scala and DeCicco concluded that management at the Cocoa office was "broken" and that immediate changes were needed. Scala Aff., ¶ 12; DeCicco Aff., ¶¶ 9–10. The Collective Bargaining Agreement between the State of Florida and the Florida Police Benevolent Association's Security Services Bargaining Unit (the

"CBA") permits the FDOC, in its discretion, to transfer an employee to a different duty station located within 50 miles of the employee's current duty station "according to the needs of the [FDOC]." Scala Aff., ¶ 14; DeCicco Aff., ¶ 10; Doc. 112-2, pp. 25–26.  Based on this provision, Scala and DeCicco recommended to their supervisors that Plaintiff and Jordan be transferred to different duty stations within a 50-mile radius of the Cocoa office.  Scala Aff., ¶¶ 13–14; DeCicco Aff., ¶ 10.    Scala and DeCicco's recommendations were approved by upper management and the FDOC's Office of Workplace Compliance.  Scala Aff., ¶ 13.  Scala and DeCicco aver that neither Plaintiff's gender nor any workplace speech by her was considered in the decision to reassign her.  Scala Aff., ¶ 14; DeCicco Aff., ¶ 12.

On August 4, 2009, Plaintiff was told that she had the option to either accept a reassignment to the Melbourne office—approximately 23 miles from the Cocoa office—and maintain her job title and pay, or stay at the Cocoa office but be demoted to a Correctional Probation Specialist and have her pay decreased by five percent.  DeCicco Aff., ¶ 10; Pl.'s Dep. 57:4–58:18; *see* Doc. 112-2, p. 13.  The reassignment to the Melbourne office was to be effective August 21, 2009.  *See* Doc. 112-2, p. 29.  Plaintiff chose the reassignment to the Melbourne office.  Pl.'s Dep. 60:6–11.  Jordan, meanwhile, was reassigned to the Titusville office.  DeCicco Aff., ¶ 10; Jordan Aff., ¶ 4.  Jordan and DeCicco aver that this reassignment was involuntary and that he did not request it.  DeCicco Aff., ¶ 10; Jordan Aff., ¶ 4.  According to Plaintiff, however, Jordan told her that he asked to be transferred to the Titusville office.  Pl.'s Dep., 148:8–19.

After being told of her options, Plaintiff retained an attorney and, in a letter from her attorney dated August 17, 2009, filed a Step 1 Grievance challenging the proposed transfer or demotion.  *See* Doc. 115-2, pp. 19–20.  While the grievance was pending, Plaintiff continued reporting to work at the Cocoa office through August 20, 2009.  Pl.'s Dep., 17:19–25.  On

August 21, 2009, Plaintiff did not report to work at the Melbourne office as required by the reassignment, and instead began a period of leave under the Family and Medical Leave Act ("FMLA") for generalized anxiety disorder, which she claims resulted from the stress imposed on her by management. *Id.* at 17:19–18:25, 19:13–15.

The grievance process continued while Plaintiff was on FMLA leave. In a letter dated September 1, 2009 responding to Plaintiff's Step 1 Grievance, the FDOC again offered Plaintiff the option of remaining at the Cocoa office with a demotion to the position of a Correctional Probation Specialist, but this time without a reduction in pay. DeCicco Aff., ¶ 10; Pl.'s Dep., 59:5–60:5; *see* Doc. 115-2, pp. 9–10. In a letter from her attorney dated September 4, 2009, Plaintiff rejected the FDOC's offer and proceeded to a Step 2 Grievance. *See* Doc. 111-2, p. 5.

On November 24, 2009, while the Step 2 Grievance was pending, DeCicco sent Plaintiff a letter notifying her that she had exhausted her FMLA leave. DeCicco Aff., ¶ 18; *see* Doc. 112-2, p. 8. In the letter, DeCicco instructed Plaintiff that she was required to either report to the Melbourne office the next business day after receiving the letter or, alternatively, inform the supervisor in that office, James Michael Asbury ("Asbury"), why she could not report. DeCicco Aff., ¶ 18; Doc. 112-2, p. 8. Thereafter, Plaintiff did not report to work at the Melbourne office or any other FDOC office through the date of her eventual termination. Pl.'s Dep., 17:19–18:9. Plaintiff testified that she did not report to the Melbourne office because she believed her reassignment was in retaliation for the previous complaints she had made to management about being too overworked to properly complete IT60 reviews. Pl.'s Dep., 92:6–8, 127:19–25. In addition, she feared further retaliation from Asbury, against whom she had filed a whistleblower complaint in 1992 for allegedly preventing her from being promoted. *Id.* at 62:3–5, 92:6–9, 128:1–11, 131:20–132:10.

Following a meeting with an FDOC management representative on December 17, 2009, Plaintiff's Step 2 Grievance was denied and she proceeded to a Step 3 Grievance. DeCicco Aff., ¶ 10; *see* Doc. 112-2, p. 25. On December 23, 2009, the Florida Department of Management Services ("DMS") issued a final, binding decision on her Step 3 Grievance. DeCicco Aff., ¶ 10; *see* Doc. 112-2, pp. 25–30. DMS upheld the FDOC's decision to reassign Plaintiff to the Melbourne office and denied Plaintiff's request to remain in the Cocoa office at the same position and pay. DeCicco Aff., ¶ 10; *see* Doc. 112-2, pp. 25–30. DMS found that the FDOC's decision to transfer Plaintiff was not a disciplinary action, but instead was made in accordance with the needs of the FDOC in effecting changes in leadership in the Cocoa office. Doc. 112-2, pp. 28–30.

While Plaintiff was absent from work, an FDOC review of her work files revealed that Plaintiff had improperly marked two IT60 forms as complete when they were, in fact, incomplete. Scala Aff., ¶ 16; DeCicco Aff., ¶ 14. Scala and DeCicco attested that, as a result of these omissions, two inmates remained incarcerated for four and eight months, respectively, without being referred for residential treatment. Scala Aff., ¶ 16; DeCicco Aff., ¶ 14. In December 2009, the FDOC informed Plaintiff's attorney that it would be pursuing disciplinary action with respect to these incidents by scheduling a predetermination hearing. Scala Aff., ¶ 17; DeCicco Aff., ¶ 15. After being rescheduled twice, the predetermination hearing was set for February 5, 2010, one of the dates suggested by Plaintiff's attorney. Scala Aff., ¶ 17; DeCicco Aff., ¶ 15; *see* Doc. 111-2, p. 4. In a letter dated January 14, 2010 notifying Plaintiff of the new hearing date, DeCicco wrote that Plaintiff would have the opportunity to review case files and casenotes of the inmates who had remained incarcerated, and that the files would be available for review at the Cocoa office at any time. Scala Aff., ¶ 17; DeCicco Aff., ¶ 15; *see* Doc. 112-2, p.

17.    Plaintiff contends that she was medically unable to review the files before the predetermination hearing because visiting the Cocoa office would have triggered her generalized anxiety disorder.  Pl.'s Dep., 40:2–7.  Plaintiff also contends that certain other documents were not provided by the FDOC before the hearing.  *Id.* at 40:9–41:3.  On February 5, 2010, Plaintiff, accompanied by her attorney, appeared and testified at the predetermination hearing, at which point additional documents supporting the disciplinary action were provided to Plaintiff.  *Id.* at 45:14–19, 46:15–17; Scala Aff., ¶¶ 17–18; DeCicco Aff., ¶ 15.

While adjudication of this disciplinary action was pending, the FDOC pursued a separate disciplinary action against Plaintiff due to her failure to report to work since being notified about the exhaustion of her FMLA leave in November 2009.  In a letter dated January 29, 2010 and hand-delivered to Plaintiff on February 5, 2010, the FDOC informed Plaintiff that it intended to terminate her employment for this reason, effective February 12, 2010.  DeCicco Aff., ¶ 19; *see* Doc. 112-4, pp. 28–29.  The letter stated that the FDOC would provide Plaintiff with the opportunity to request a predetermination hearing, which she did.  *See* Doc. 112-4, pp. 28–29; DeCicco Aff., ¶ 21.  After being offered the opportunity to attend a predetermination hearing on two different dates, neither Plaintiff nor her attorney attended a May 12, 2010 hearing, either in person or telephonically.  Pl.'s Dep., 42:7–20, 122:20–123:5; Scala Aff., ¶ 23; DeCicco Aff., ¶ 21; *see* Doc. 112-2, p. 3.  Plaintiff testified that her generalized anxiety disorder, as well as a fractured clavicle, prevented her from attending the hearing.  Pl.'s Dep., 42:18–43:4, 123:1–11.

Following the predetermination hearings, the FDOC's decisions on the two disciplinary actions were issued on May 11 and 12, 2010.  In a letter dated May 11, 2010, Plaintiff was notified that she would be suspended without pay for ten work days for her omissions on the IT60 forms with regard to the two inmates who remained incarcerated.  Pl.'s Dep., 35:7–8; Scala

Aff., ¶ 19; DeCicco Aff., ¶ 16; *see* Doc. 112-2, pp. 19–20.  Then, in a letter dated May 12, 2010,

Plaintiff was notified that her employment was being terminated, effective May 28, 2010, due to

her failure to report to work following the exhaustion of her FMLA leave.  Scala Aff., ¶ 23;

DeCicco Aff., ¶ 21; *see* Doc 112-2, pp. 3–4.  The letter stated that, since Plaintiff failed to attend

the second predetermination hearing, a decision had been made based on the information that

was available to the FDOC.  Doc 112-2, p. 3.  Both the May 11 and May 12 letters notified

Plaintiff that she had a right to file an administrative appeal or a collective bargaining grievance.

*See* Doc 112-2, pp. 4, 20.  Plaintiff did neither, and her employment was terminated on May 28,

2010.  Pl.'s Dep., 18:10–11, 125:9–126:8; Scala Aff., ¶ 23.

During the period following her reassignment to the Melbourne office but before her

second predetermination hearing, Plaintiff also filed two charges of discrimination with the

Florida Commission on Human Relations ("FCHR"), claiming that she had been retaliated

against for engaging in previous whistleblower activity.[3]  *See* Doc. 112-3, pp. 2–10, 13–20.  In

the first charge, she alleged that she was given a negative performance evaluation and

involuntarily transferred to the Cocoa office because she had complained to Jordan that

supervisors were too overworked to properly complete their IT60 reviews within the 60-day time

limit.  *Id.* at 2–3.  In that charge, Plaintiff claimed, for the first time, that the inability to complete

---

[3] The first charge was filed on September 25, 2009 and the second charge was filed on April 21, 2010.  *See* Doc. 112-3, pp. 3, 22.  It appears that copies of the charges were also filed with the Governor's Office, the Office of the Chief Inspector General, the Secretary of the FDOC, and the FDOC's Office of the General Counsel.  *See* Pl.'s Dep., 63:18–64:1, 105:23–106:6.  In addition, Plaintiff testified that she filed a charge of retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), but that the EEOC's investigation of this charge was terminated upon her request so she could commence this action.  *Id.* at 88:25–89:4, 90:8–16, 152:2–6.

the reviews violated Florida's Jessica Lunsford Act and created a risk to the public.[4]  *Id.* at 3;

Pl.'s Dep., 76:11–19.  In the second charge, Plaintiff alleged that the FDOC retaliated against her

for filing her first retaliation charge by, among other things, terminating her employment.  *Id.* at

13.  In each case, an FCHR investigator concluded that there was no reasonable cause to believe

that the FDOC had retaliated against Plaintiff, and the FCHR therefore terminated the

investigations.  *Id.* at 10, 31; *see* Doc. 112-2, pp. 22–23; Doc. 112-3, pp. 22–23.

### B.     Procedural History

Plaintiff commenced this action by filing the Complaint with this Court on April 18,

2011, alleging various federal and state law claims against the FDOC, Scala, and DeCicco

arising from the termination of her employment with the FDOC.  *See* Doc. 1.  Plaintiff averred

that she had previously filed timely charges of discrimination and retaliation with the EEOC and

the FCHR, and that both agencies had issued right to sue letters.  *See id.* at ¶ 25.  On June 22,

2011, Plaintiff exercised her right to file an Amended Complaint pursuant to Federal Rule of

Civil Procedure 15(a)(1).  *See* Doc. 8.  After obtaining leave of court, Plaintiff filed a Second

Amended Complaint on August 19, 2011, this time adding FDOC Secretary Edwin G. Buss (the

"FDOC Secretary") as a defendant.  *See* Doc. 20.  After the defendants filed motions to dismiss,

*see* Docs. 22, 23, the Court dismissed the Second Amended Complaint as a shotgun pleading, but

granted Plaintiff leave to file a Third Amended Complaint.  *See* Doc. 59.

On August 3, 2012, Plaintiff filed a Third Amended Complaint.  *See* Doc. 62.  Again, the

defendants filed motions to dismiss, *see* Docs. 67, 68, to which Plaintiff responded.  *See* Docs.

76, 77.  On April 2, 2013, the Court held a hearing on the motions to dismiss.  *See* Doc. 95.  At

---

[4] The Jessica Lunsford Act, signed into law in 2005, created additional restrictions for sexual offenders in the State of Florida.  *See generally* 2005 Fla. Sess. Law Serv. Ch. 2005-28 (West). Plaintiff's previous complaints to management did not specifically raise the Jessica Lunsford Act or any general risks to the public, but rather addressed purported violations of FDOC policies and procedures.  *See* Doc. 112-2, p. 3; Pl.'s Dep., 74:2–11.

the hearing, the Court entered an oral Order granting in part and denying in part the motions to dismiss, as set forth on the record, while also deferring a ruling on certain other issues in the motions to dismiss.  *See* Doc. 96.  Subsequently, the Court entered a written Order resolving the remaining issues in the motions to dismiss.  *See* Doc. 104.  As a result of the Court's Orders, all of Plaintiff's claims were dismissed except:  (1) Count One against DeCicco and Scala in their individual capacities; (2) Count Four against the FDOC; and (3) Count Fifteen against DeCicco and Scala in their individual capacities.  *See id.* at 18.

On May 27, 2013, Plaintiff filed a Notice of Appeal, expressing her intent to appeal the rulings in the Court's oral and written Orders.[5]  *See* Doc. 108.  On June 10, 2013, the FDOC filed its Motion for Summary Judgment, and DeCicco and Scala filed their Motion for Summary Judgment seeking a judgment in their favor on the remaining claims.  *See* Docs. 116, 117.  Because Plaintiff failed to file a timely response to the Motions for Summary Judgment, the Court entered an Order on July 15, 2013 ("July 15, 2013 Order"), directing her to respond to the Motions within fourteen days, and advising her that failure to do so would result in the Court considering the Motions as unopposed.  *See* Doc. 123.

On July 23, 2013, Plaintiff filed a response to the Court's July 15, 2013 Order ("Motion to Rescind"), requesting that the Court rescind that Order.  *See* Doc. 124.  In the Motion to Rescind, Plaintiff argued that upon the filing of her appeal, this Court was divested of jurisdiction over the Motions for Summary Judgment.  *See id.*  Thereafter, on July 29, 2013, Plaintiff filed her Response to the Motions for Summary Judgment, which she filed "in recognition of the deadline set by the court but stat[ing] that this filing is not to be construed as a formal response to the pending motion[s]."  Doc. 125.  She further stated that "she [was] not, by

_____

[5] Plaintiff's appeal was dismissed for want of prosecution on June 27, 2013, but reinstated by the Court of Appeals on July 1, 2013.  *See* Docs. 120, 121.

the filing of this notice, acceding to this court's jurisdiction to proceed with the motion[s] for summary judgment." *Id.* She also requested clarification of the Court's July 15, 2013 Order given the pending appeal and, in the event that the Court determined that it retained jurisdiction to proceed with the Motions for Summary Judgment, requested additional time to prepare a substantive response to the Motions. *See id.*

On August 1, 2013, the Court entered an Order denying Plaintiff's Motion to Rescind. *See* Doc. 133. The Court noted that its written and oral Orders on the motions to dismiss did not adjudicate all the claims in the case, and therefore the Orders did not operate as an appealable final judgment, absent a Rule 54(b) certification from the Court which Plaintiff had not requested. *Id.* at 5. As such, the Court explained that it continued to retain jurisdiction over the case.[6] *Id.* at 6. The Court granted Plaintiff another opportunity to file a response to the Motions for Summary Judgment, directing her to respond to the Motions within seven days, and advised her that failure to do so would result in the Court considering the Motions as unopposed. *See* Doc. 133.

On August 8, 2013, Plaintiff filed a document titled "Response to Defendants' Motions for Summary Judgment; Renewal of Objection to District Court Exercise of Jurisdictional Authority." *See* Doc. 134. In that filing, Plaintiff reiterated her argument that the filing of the Notice of Appeal had divested this Court of jurisdiction over the case, and again requested that the Court reconsider its continued exercise of jurisdiction. *See id.* Plaintiff did not provide any substantive response to the Motions for Summary Judgment. *See id.* Thereafter, on August 21,

---

[6] The Court also explained that it retained jurisdiction over the claims addressed in the Motions for Summary Judgment because any rulings on those claims would not affect the Court of Appeals' review of this Court's rulings on the motions to dismiss. *Id.* at 6–7.

2013, the Court of Appeals dismissed Plaintiff's appeal for lack of jurisdiction, *see* Doc. 135, rendering moot her arguments regarding this Court's jurisdiction.

As Plaintiff has ignored this Court's repeated directives to file a response to the Motions for Summary Judgment, the Court now considers the Motions without any substantive response from Plaintiff.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 323.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact.  *Id.* at 324.  Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248-49 (emphasis in original).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.* at 248.  In determining whether a genuine issue of material fact exists,

the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

## III.   DISCUSSION

As a result of this Court's previous rulings, three claims remain:  (1) Count One – violation of Plaintiff's right to free speech under the First and Fourteenth Amendments against DeCicco and Scala in their individual capacities; (2) Count Four – sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") against the FDOC; and (3) Count Fifteen – violation of Plaintiff's procedural due process rights under the Fourteenth Amendment against DeCicco and Scala in their individual capacities.  *See supra*, Part I.B.  Each claim is addressed below.

### A.      Plaintiff's Sex Discrimination Claim Against the FDOC

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff in a Title VII action may attempt to show discrimination by offering either direct or circumstantial evidence.  *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).  "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption."  *Id.* (internal punctuation and quotations omitted).  Indeed, "direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor."  *Id.*  Based on the Court's review of the evidence in this case— which consists of Plaintiff's deposition testimony, the affidavits of Scala, DeCicco, and Jordan, and the respective exhibits thereto—the Court discerns no remarks which rise anywhere near the level of direct evidence of sex discrimination.  Plaintiff must therefore establish her case through circumstantial evidence.

Where, as here, a plaintiff attempts to prove disparate treatment in violation of Title VII using circumstantial evidence rather than direct evidence, courts apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Under this framework:

> [T]he plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class . . . .
>
> When the plaintiff establishes a prima facie case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The employer need not persuade the court that it was actually motivated by the proffered reasons. If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination.
>
> If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient. The evidence of pretext may include, however, the same evidence offered initially to establish the prima facie case.
>
> Despite the shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.

*Id.* at 1087–88 (internal citations and quotations omitted).

1.      *Plaintiff's Prima Facie Case*

To establish a prima facie case of sex discrimination, Plaintiff must show that:  (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  The FDOC does not dispute that Plaintiff has satisfied the first and fourth prongs of her prima facie case.  Doc. 116, p. 11.  Rather, the FDOC argues that Plaintiff's lateral reassignment to the Melbourne office did not constitute an adverse employment action because it did not involve a demotion in pay, title, responsibilities, or prestige.  *Id.* at 12–19.  The FDOC also disputes that Jordan was treated more favorably, asserting that he was also forced to transfer to a different office.  *Id.* at 20–22.

The Court agrees that Plaintiff's lateral reassignment to the Melbourne office did not constitute an adverse employment action under Title VII.[7]  To establish an adverse employment action in a Title VII discrimination claim, an employee "must show a *serious and material change* in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the

_____

[7] As Plaintiff has failed to present any argument, the Court can only assume that the adverse action complained of is Plaintiff's lateral reassignment to the Melbourne office, and not her eventual termination, because her termination would clearly be justified due to her failure to report to work after the exhaustion of her FMLA leave.  *Cf. Nash v. Palm Beach County Sch. Dist.*, No. 08-80970-CIV, 2010 WL 3220191, at *8 n.8 (S.D. Fla. Aug. 13, 2010), *aff'd*, 469 F. App'x 712 (11th Cir. 2012) (noting that the adverse act at issue was the plaintiff's transfer, and could not be termination, where the plaintiff had been transferred to another position and failed to report to work, which would justify dismissal).  The Court's assumption is supported by the allegations in Plaintiff's Third Amended Complaint corresponding to her sex discrimination claim, which appear to assert that the lateral reassignment was the adverse act.  *See* Doc. 62, ¶¶ 111–41.

The Court also notes that the opportunity presented to Plaintiff to remain in the Cocoa office, but with a lesser title, does not amount to an adverse employment action because she declined this option and accepted the reassignment to the Melbourne office.  *See Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 n.10 (11th Cir. 2000) ("A proposed uneffectuated transfer is not an adverse employment action.").

employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). "Although [Title VII] does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* Put simply, "the protections of Title VII simply do not extend to everything that makes an employee unhappy." *Id.* at 1242. Thus, the Eleventh Circuit has held that "a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." *Hinson*, 231 F.3d at 829 (citing *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998)). A transfer can also be adverse if it "involve[s] arduous travel or ... impede[s] an employee's professional growth or advancement." *Doe*, 145 F.3d at 1452.

Here, Plaintiff has not shown a serious and material change in the terms, conditions, or privileges of her employment, as viewed objectively by a reasonable person under the circumstances. For one, the CBA governing Plaintiff's employment permitted the FDOC to move her to another office within 50 miles of the Cocoa office in accordance with the FDOC's needs. *See* Doc. 112-2, p. 26. As such, Plaintiff was on notice that she could be reassigned to another office in the region at the FDOC's whim. In addition, it is undisputed that, had Plaintiff reported to the Melbourne office, her pay, job title, and responsibilities would remain the same. *See* DeCicco Aff., ¶ 11. While there is evidence that Plaintiff's commute would have increased by approximately 21 miles, *see* Pl.'s Dep., 57:6–11, this is not the kind of "arduous travel" by which the Eleventh Circuit has held a transfer to be a serious and material change in the terms and conditions of employment. *See Doe*, 145 F.3d at 1452. Indeed, in the case that the *Doe* court cited for the proposition that arduous travel could make a transfer "adverse," the prospective employer had changed its offer of employment from a location in Atlanta, Georgia to

a location in Huntsville, Alabama, more than three hours away from Atlanta. *Maddow v. Procter & Gamble Co., Inc.*, 107 F.3d 846, 852–53 (11th Cir. 1997). Thus, Plaintiff's increased commute to the Melbourne office would not have been a serious and material change in the terms and conditions of her employment. *See Williams v. Fla. Dep't of Corr.*, No. 3:09-cv-213, 2011 WL 1085030, at *5 (N.D. Fla. Mar. 22, 2011) ("While a transfer over a great distance might qualify [as an adverse employment action], transfers that simply increase the distance of the employee's commute do not."). Nor is there any evidence that Plaintiff's reassignment would diminish her prestige or her opportunities for professional growth or advancement. To the contrary, Plaintiff admits that she "could [have] continue[d] on the path of being a supervisor" if she had reported to the Melbourne office. Pl.'s Dep., 58:17–18. In sum, Plaintiff has failed to show that her reassignment to the Melbourne office constituted a serious and material change in the terms, conditions, or privileges of her employment. *See Williams*, 2011 WL 1085030, at *5 (holding that an FDOC employee's lateral reassignment to another duty station within 50 miles from his former duty station did not constitute an adverse employment action under Title VII where the reassignment did not change his salary, classification, or work status and merely increased his commute). Therefore, Plaintiff has not satisfied the second prong of a prima facie case of sex discrimination.

Plaintiff has also failed to satisfy the fourth prong of her prima facie because she has not shown that the FDOC treated Jordan more favorably. It is undisputed that Jordan, like Plaintiff, was reassigned to another FDOC office within 50 miles of the Cocoa office immediately following the agency's investigation of the management problems in the Cocoa office. *See* DeCicco Aff., ¶ 10; Jordan Aff., ¶ 4. Plaintiff contends that Jordan's reassignment, unlike hers, was voluntary because he asked to be reassigned to the Titusville office. *See* Pl.'s Dep., 148:8–

19.   However, this assertion is based on her deposition testimony about statements that Jordan allegedly made to her before the reassignment.   *See id.* Plaintiff's testimony is directly contradicted by the affidavits of DeCicco and Jordan, who both attested, on personal knowledge, that Jordan's reassignment was involuntary and that he did not request to be transferred to the Titusville office.   *See* DeCicco Aff., ¶ 10; Jordan Aff., ¶ 4.   Furthermore, Plaintiff's subjective belief that she was treated differently from Jordan because of her sex is insufficient evidence to establish a prima facie case.   *See* Pl.'s Dep., 185:1–190:4; *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).   Because the record is devoid of sufficient evidence upon which a reasonable juror could find that the FDOC treated a similarly situated male employee more favorably, Plaintiff has failed to establish the fourth prong of her prima facie case.

### 2.   *The FDOC's Legitimate, Nondiscriminatory Reasons*

Even   assuming   *arguendo*   that   Plaintiff   had   established   a   prima   facie   case   of discrimination, that would merely shift the burden to the FDOC to proffer at least one legitimate, nondiscriminatory reason for reassigning her to the Melbourne office.   *See Wilson*, 376 F.3d at 1087.   This intermediate burden is "exceedingly light."   *Holifield*, 115 F.3d at 1564.   Here, the FDOC has carried its burden, offering several justifications for the reassignment.   The FDOC points to DeCicco and Scala's investigation of the Cocoa office, which revealed management issues that had a negative impact on work quality and morale there.   *See* Scala Aff., ¶ 11; DeCicco Aff., ¶ 9.   Specifically, staff members in the office complained about Plaintiff's management style and the tension between her and Jordan.   *See* Scala Aff., ¶ 10; DeCicco Aff., ¶ 9.  DeCicco and Scala attested that, following their investigation, they determined it was in the agency's best interest to reassign Plaintiff and Jordan to another office due to the management problems in the Cocoa office.   *See* DeCicco Aff., ¶ 10; Scala Aff., ¶ 14.   The FDOC also submitted evidence that Plaintiff struggled with completing her work in a timely manner, and

that she was improperly entering re-review codes to give herself more time to complete IT60 reviews, in contravention of her supervisors' instructions and FDOC policies. *See* Doc. 115-2, pp. 5, 7; Pl.'s Dep., 79:3–7; DeCicco Aff., ¶ 5. A factfinder could reasonably find that the foregoing reasons would motivate a reasonable employer to make the reassignment decision. Therefore, the FDOC has satisfied its burden of articulating one or more legitimate, nondiscriminatory reasons for the reassignment.

### 3.        *Plaintiff's Burden of Showing Pretext*

Because the FDOC has satisfied its burden, the burden shifts back to Plaintiff to provide sufficient evidence showing that the legitimate reasons offered by the FDOC were a pretext for discrimination. *See Wilson*, 376 F.3d at 1087. Plaintiff may satisfy her burden either by offering evidence that the FDOC more likely than not acted with a discriminatory motive, or by showing that the FDOC's proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). To show pretext, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [FDOC's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* Plaintiff cannot simply recast the FDOC's proffered nondiscriminatory reasons or substitute her business judgment for that of the FDOC. *Id.* Rather, she must meet those reasons head on and rebut them, and she cannot succeed by simply quarreling with the wisdom of those reasons. *Id.* at 1266.

The record does not contain a single statement by an FDOC employee which constitutes even circumstantial evidence of discriminatory animus. In fact, the Court has not uncovered any statement by an FDOC employee relating to sex. Therefore, Plaintiff has failed to show that a

discriminatory motive more likely than not motivated the FDOC's decision to reassign her to the Cocoa office.

Nor has Plaintiff produced sufficient evidence to show that the FDOC's asserted justifications are unworthy of credence.  Plaintiff's subjective belief that she was treated differently from Jordan due to her sex is insufficient evidence to survive summary judgment, and is unsupported by admissible evidence which could be believed by a reasonable jury.  *See supra*, Part III.A.1.  Moreover, Plaintiff admits that there were "management problems" in the Cocoa office due to her and Jordan's "different philosoph[ies]" of being a supervisor, and that these differing philosophies led to "friction" between the two of them.  Pl.'s Dep., 55:1–21.  Plaintiff also acknowledges that she entered re-review codes when IT60 reviews were not complete in order to provide herself with additional time to complete the reviews.  Pl.'s Dep., 32:11–15, 69:21–24, 73:11–14.  Thus, she has in fact bolstered the FDOC's asserted reasons for reassigning her.  In sum, Plaintiff has failed to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the FDOC's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.  *See Alvarez*, 610 F.3d at 1265.  Therefore, Plaintiff has failed to carry her burden of demonstrating pretext, and the FDOC is entitled to summary judgment on her sex discrimination claim.

### B.       Plaintiff's Claims Against DeCicco and Scala

Counts One and Fifteen of the Third Amended Complaint assert claims under 42 U.S.C. § 1983 for alleged violations of Plaintiff's free speech and procedural due process rights under the First and Fourteenth Amendments, respectively.  *See* Doc. 62, pp. 13, 74.  DeCicco and Scala contend that they are entitled to qualified immunity on these claims.  *See* Doc. 117.

With regard to § 1983 claims, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary

authority if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harassive litigation[.]"  *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987)).

To establish that the challenged actions were within the scope of her discretionary authority, a defendant must show that those actions were:  "(1) undertaken pursuant to the performance of [her] duties, and (2) within the scope of [her] authority."  *Gray ex. rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (internal citations and quotations omitted).  Here, there can be no serious dispute that DeCicco and Scala made their decisions regarding Plaintiff's employment while they were acting within the course and scope of their duties as FDOC administrators.

Once it is established that a defendant was acting within the course and scope of her duties, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  *McCullough,* 559 F.3d at 1205.  To do so, the plaintiff must satisfy the two-prong test articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, the Court asks whether the evidence, viewed in the light most favorable to the plaintiff, shows that the government official violated the plaintiff's constitutional rights.  *McCullough*, 559 F.3d at 1205.  Second, if such a violation occurred, then the Court must determine whether it was clearly established at the time of the incident that the actions of the government official were unconstitutional.  *Id*.  Specifically, to defeat summary judgment, a plaintiff facing a defendant's alleged qualified immunity must produce evidence of a factual dispute raising a genuine issue of

fact material to the determination of the underlying issue—here, whether DeCicco and Scala violated Plaintiff's free speech or procedural due process rights.  *Id.*

### 1.  Plaintiff's Free Speech Claim

While it is well-established that a government employer may not demote or discharge a public employee in retaliation for the employee's exercise of her right to free speech, that right is not absolute.  *Travers v. Jones*, 323 F.3d 1294, 1296 (11th Cir. 2003); *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1157 (11th Cir. 2002).  As the Supreme Court first explained in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Following *Pickering*, the Eleventh Circuit developed a four-part test for determining whether a government employer had violated a public employee's free speech rights.  To prevail under this test, the employee was required to show that:

> (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action.  If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech.  The first two steps are questions of law; the final two steps are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech.

*Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (internal citations and quotations omitted).

The Eleventh Circuit modified the first step of this test following the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  In *Garcetti*, the Supreme Court emphasized that a public employee must speak *both* on a matter of public concern *and* as a

citizen, rather than as an employee, to be protected under the First Amendment.  547 U.S. at 416–22.  As a result, the Eleventh Circuit now requires district courts to determine at the outset: (1) if the government employee spoke as an employee or citizen; and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern.  *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007).  "To qualify as constitutionally protected speech in the First Amendment government employment retaliation context that warrants the *Pickering* analysis, . . . the speech must be made by a *government employee speaking as a citizen and be on a subject of public concern*.  If the government employee, however, was speaking as an employee, then there can be no First Amendment issue, and the constitutional inquiry ends with no consideration of the *Pickering* test."  *Id.* at 1342–43 (internal citations omitted).

In light of these instructions, the Court must first decide whether Plaintiff spoke on behalf of the public as a citizen, or whether she spoke for herself as an employee.  *Id.* at 1343.  The Court makes this determination based on the "content, form, and context of a given statement, as revealed by the whole record."  *Id.*  The mere fact that an employee makes her speech through workplace resources is not dispositive, as "[m]any citizens do much of their talking inside their respective workplaces."  *D'Angelo v. Sch. Bd. of Polk County, Fla.*, 497 F.3d 1203, 1211 (11th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 420).  Also nondispositive is the fact that an employee's speech concerns the subject matter of her employment.  *Id.* (quoting *Garcetti*, 547 U.S. at 421).

In *Boyce*, the two plaintiffs were case managers in a county agency responsible for investigating and supervising cases involving child welfare and abuse.  *Id.* at 1336.  Case managers were required to respond to allegations of child abuse or neglect, and eventually take certain actions and close the case, within specified time periods.  *Id.* at 1336–37.  The agency

was experiencing very high caseloads, and the plaintiffs made verbal, email, and other written complaints about the size of their caseloads to their supervisors. *Id.* at 1337–39. In some of these complaints, the plaintiffs raised concerns about the effect that the large caseloads would have on child safety. *Id.* One plaintiff, who had missed several deadlines for closing cases, was placed on a work performance plan with deadlines for closing the overdue cases. *Id.* at 1338. At an office meeting, she voiced concerns about the agency's operations to her supervisors. *Id.* After the meeting, she was notified that she had been dismissed, which the agency claimed was due to her inability to meet the deadlines of her performance plan. *Id.* The other plaintiff was transferred to another unit with a loss in pay. *Id.* at 1340. The plaintiffs filed a § 1983 action against their supervisors, alleging that their termination and transfer, respectively, were retaliation for their protected First Amendment speech. *Id.*

After the district court found that the plaintiffs had adequately demonstrated a First Amendment violation and denied the defendants qualified immunity, the Eleventh Circuit reversed. *Id.* at 1341, 1347. In examining the form and context of the complaints made by the plaintiffs, the Court of Appeals found it important that the complaints were "intended to address only matters connected with [the plaintiffs'] jobs at [the agency]." *Id.* at 1343. Specifically, the complaints "focus[ed] on their respective views that their caseloads were too high, which caused each not to meet expected deadlines, and their consequent need for assistance." *Id.* at 1343–44. Moreover, the complaints "were not sent to an outside entity" and "did not address any subject not personal to [their] working conditions at [the agency]." *Id.* at 1344. As to the concerns voiced by one of the plaintiffs at the open staff meeting, the court observed: "Significantly, this speech by Boyce occurred *after* she had been reprimanded and placed on a performance plan because of performance issues raised by [the defendants] and *after* her dismissal had been

recommended . . . and approved . . . .  Therefore, her remarks at the meeting could not have been an instigating factor in the employment decisions of any of her defendant supervisors."  *Id*.  The court concluded that the plaintiffs "were complaining to their superiors as employees about their workloads for a work reason:  they wanted to have their caseloads reduced or to receive help with their work.  The purpose of their grievances clearly was not to raise public awareness about children within the care of DeKalb DFCS."  *Id.* at 1346.  Because the plaintiffs were speaking as government employees about their jobs and not as citizens, the court held that they had no First Amendment claim based on their supervisors' reaction to the speech, and there was no need to engage in the *Pickering* balancing analysis.  *Id*.  Notably, the court also rejected the plaintiffs' attempt to characterize themselves as whistleblowers, finding that this characterization was irrelevant in light of the court's conclusion that the plaintiffs were not speaking as private citizens.  *Id.* at 1347 n.15.

Similarly here, the Court concludes that Plaintiff was primarily speaking as a government employee, not a private citizen, because her complaints were aimed at improving her work conditions, not at reducing any danger to the public posed by delays in closing probation case reviews.  In her email and verbal complaints to management, Plaintiff protested her excessive workload and claimed that the workload prevented her and other supervisors from completing case reviews in accordance with FDOC policies.  *See* Doc. 112-3, pp. 2–4; Pl.'s Dep., 74:7–11, 104:24–106:2.  These complaints, like the *Boyce* plaintiffs', are purely related to working conditions at Plaintiff's place of employment.  Moreover, these claims were made after her supervisors had identified deficiencies in her performance and, therefore, they were an effort to rehabilitate her standing in the view of her supervisors.  Doc. 112-3, pp. 2–4.  This is further evidence that Plaintiff's speech was concerned primarily with her own interests in mind.

Additionally, in her verbal and email complaints, Plaintiff did *not* allege that the delays in closing the reviews were creating a danger to the public or violating the Jessica Lunsford Act. *See id.* at 3; Pl.'s Dep., 74:2–11.  Notably, the first time she expressed a concern over a danger to the public or violations of the Jessica Lunsford Act was *after* her reassignment, in her first retaliation charge submitted to the FCHR.  *See* Doc. 112-3, p. 3; Pl.'s Dep., 76:11–19.  This charge, as well as the second retaliation charge that she submitted to the FCHR, were similarly concerned primarily with challenging the FDOC's decisions to transfer and discharge her, and thus were intended to address only matters connected with Plaintiff's job at the FDOC. Accordingly, it is clear that Plaintiff's speech addressed merely personal grievances with her job. Therefore, she was speaking only as a government employee, not as a private citizen, and there is no need for the Court to conduct a *Pickering* analysis because Plaintiff's speech is not entitled to First Amendment protection.[8]   *See Boyce*, 510 F.3d at 1346.  As Plaintiff has failed to demonstrate a violation of her First Amendment rights, DeCicco and Scala are entitled to qualified immunity on this claim.

### 2.   *Plaintiff's Procedural Due Process Claim*

The Supreme Court has held that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.  When protected interests are implicated, the right to some kind of prior

---

[8] Even if the Court had concluded that Plaintiff was speaking as a citizen on a matter of public concern, a *Pickering* analysis would prove unavailing to her cause.  For the reasons explained previously in Part III.A.1, *supra*, Plaintiff is unable to demonstrate an adverse employment action, and thus fails the third step of the *Pickering* analysis.  *See Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1300–01 (11th Cir. 2005) (describing a standard for an adverse employment action in First Amendment retaliation cases which is similar to the standard used in Title VII discrimination cases).  In addition, for the reasons explained previously in Parts III.A.2 & 3, *supra*, the Court would be compelled to find, as a matter of law, that the same employment decisions would have been made by the FDOC even in the absence of any protected speech by Plaintiff.  Thus, Plaintiff would fail the fourth step, as well, even though that step is normally a fact question for the jury.  *Cook*, 414 F.3d at 1318.

hearing is paramount.  But the range of interests protected by procedural due process is not infinite."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972).  Therefore, when reviewing a procedural due process claim, the threshold question is whether the plaintiff was deprived of a protected property or liberty interest.  *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1486 (11th Cir. 1992), *overruled on other grounds by Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004).  The Eleventh Circuit has continually held that a transfer which involves no loss of pay or rank does not deprive an employee of a protected property or liberty interest.  *See id.*; *Faucher v. Rodziewicz*, 891 F.2d 864, 870 (11th Cir. 1990); *Maples v. Martin*, 858 F.2d 1546, 1550–51 (11th Cir. 1988).

In *Maples*, the Eleventh Circuit considered a procedural due process challenge from a group of tenured professors at Auburn University who had been transferred from the Mechanical Engineering Department to other engineering departments against their will.  858 F.2d at 1548. The transfer was effected by the head of the department after the professors had written a report criticizing him and describing problems within the department.  *Id.* at 1549.  None of the professors suffered any loss of income, rank, or tenure as a result of the transfers.  *Id.* at 1549 n.4.  The professors were provided approximately two months' notice before the transfers became effective.  *Id.* at 1549.  Although the university provided a grievance procedure for faculty to challenge personnel decisions, none of the professors initiated such a proceeding, and instead they challenged the transfers in a § 1983 action in federal court.  *Id.*

After the district court granted summary judgment to the defendant university administrators on the professors' procedural due process claim, the Eleventh Circuit affirmed. *Id.* at 1548.  The court concluded that the professors did not have a constitutional right to continued assignment in the Mechanical Engineering Department, observing that "transfers and

reassignments generally have not been held to implicate a property interest." *Id.* at 1550. The court noted that the transfers did not have any tangible effect on the professors' salary, rank, or job responsibilities. *Id.* Moreover, the professors had not cited any provision of the Faculty Handbook or Alabama state law which provided that a college professor could not be transferred to another department without his consent. *Id.* at 1550–51. Therefore, the court held that the professors did not have a constitutionally-protected property interest in continued assignment in the Mechanical Engineering Department.[9] *Id.* at 1551. The court further remarked that, even if the professors had demonstrated such a property interest, they had not been denied procedural due process. *Id.* First, the professors had been given adequate notice of the transfers. *Id.* In addition, the Faculty Handbook included a grievance procedure which satisfied the requirements of due process. *Id.* The court determined that the professors' failure to avail themselves of this procedure, or to present evidence that such a procedure would have been futile, precluded their claim that their procedural due process rights had been violated. *Id.*

The Court finds *Maples* to be instructive here. As the Court has explained, Plaintiff's lateral reassignment to the Melbourne office left her pay, job title, and responsibilities unchanged. *See supra*, Part III.A.1. Moreover, similar to the professors in *Maples*, Plaintiff has failed to point to a provision of the CBA or state law which provides that an FDOC employee cannot be transferred to another office. To the contrary, the CBA *explicitly states* that the FDOC, in its discretion, may transfer an employee to a different duty station located within 50 miles of the employee's current duty station according to its needs. Doc. 112-2, p. 26.

---

[9] The *Maples* court, in a footnote, also found no deprivation of the professors' *liberty* interest due to loss of reputation, because the professors had not demonstrated that their transfers were accompanied by any stigmatizing changes which "'might seriously damage [their] standing and association with [their] community' or foreclose '[their] freedom to take advantage of other employment opportunities.'" *Id.* at 1551 n.5 (quoting *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1187 (11th Cir. 1985)).

Therefore, Plaintiff had no constitutionally-protected property right in continued assignment to the Cocoa office.  Nor did Plaintiff have a protected liberty interest against injury to her reputation resulting from the lateral reassignment, if any such injury occurred.  *See Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1303 (11th Cir. 2001) (holding that a discharge plus a stigmatizing injury is necessary before a violation of an employee's liberty right can be found); *Oladeinde*, 963 F.2d at 1486 (holding that, absent a discharge or more, injury to reputation itself is not a protected liberty interest); *Maples*, 858 F.2d at 1551 n.5.

While Plaintiff did not have a constitutionally-protected right to continued assignment in the Cocoa office, the FDOC does not dispute that she *did* have a state-created property interest in continued employment with the agency.  Therefore, the Court must decide whether this property interest was violated as a result of the FDOC's decision to suspend Plaintiff without pay for ten work days or by its separate decision to terminate her employment.  *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986).  At the predetermination stage, "a tenured public employee must receive, as a matter of constitutional rights, 'notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story.'"  *Id.* at 1560 (quoting *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985)).

Here, it is undisputed that in both disciplinary actions, Plaintiff was provided notice of the charges against her.  *See* Doc. 112-2, p. 17; Doc. 112-4, pp. 28–29; Scala Aff., ¶ 17; DeCicco Aff., ¶¶ 15, 19.  In addition, she was presented with the opportunity to hear the evidence against her, and to present her own testimony and evidence, at the predetermination hearings.  Scala Aff., ¶ 20; DeCicco Aff., ¶ 17.  This is all that due process requires.  *Marshall*, 797 F.2d at 1560.  Plaintiff's decision to forego the second hearing and any appeals does not invalidate the fact that

due process was made available to her.  *Id.*; *see Maples*, 858 F.2d at 1551.  Indeed, "'[d]ue process was at Plaintiff's disposal; any deprivation of that due process clearly resulted from Plaintiff's own inaction.'"  *Marshall*, 797 F.2d at 1560 (quoting *Lewis v. Hillsborough Transit Auth.*, 726 F.2d 664, 667 (11th Cir. 1983)).  Moreover, there is no evidence before the Court that Plaintiff was denied the process due under the CBA or under FDOC policies and procedures. *See* Scala Aff., ¶ 20; DeCicco Aff., ¶ 17; *Marshall*, 797 F.2d at 1559–60 (recognizing that a discharged public employee is entitled to procedural rights afforded under the employer's regulations).  Accordingly, there was no violation of Plaintiff's procedural due process rights, and DeCicco and Scala are entitled to qualified immunity on this claim.

## IV.   CONCLUSION

For the aforementioned reasons, the Court will grant the Motions for Summary Judgment, as no genuine issues of material fact exist and there is an absence of evidence to support the causes of action in Plaintiff's Third Amended Complaint.  Defendants are entitled to judgment in their favor as a matter of law.

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

1.   Defendant Florida Department of Corrections' Motion for Summary Judgment (Doc. 116) is **GRANTED**.

2.   Defendants Edith DeCicco and Barbara Scala's Motion for Summary Judgment (Doc. 117) is **GRANTED**.

3.   The Clerk is directed to terminate any pending motions and deadlines as moot, enter judgment in favor of Defendants Florida Department of Corrections, Edith DeCicco and Barbara Scala.

4.   As all claims by the Plaintiff against the Secretary, Florida Department of Corrections, have been dismissed (Doc. 104), the Clerk is further directed to enter

judgment in favor of the Secretary, Florida Department of Corrections, and close this case.

**DONE** and **ORDERED** in Orlando, Florida on December 2, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties